| iFITZSIMMONS, Judge,
dissenting.
I respectfully disagree with the majority: this matter comes before us on a “Writ Granted” by the Louisiana Supreme Court to fully examine the issues raised. There are two “leaps of faith” that must occur for one to agree with the majority: first, there is the issue of connexity between protecting the public’s environmental quality and the position of a flagman to direct traffic at a landfill site; secondly, there is the whole question of whether the plaintiff knew, or should have known, of the existence of the Department of Environmental Quality (D.E.Q.) as a defendant. The first issue cries to the sustainment of the exception of no cause of action; while the second issue begs for all defendants to be timely sued. This is especially cogent when the plaintiff holds back from suing such a “deep pocketed” party, whose role at the landfill was readily ascertainable at all times.
*302 EXCEPTION OF NO CAUSE OF ACTION
The purpose of the statutory provisions of the Louisiana Environmental Quality Act is to provide for the “maintenance of a healthful and safe environment in Louisiana [, which] requires regulation and control over the areas of water quality, air quality, solid and hazardous waste, scenic rivers and streams, and radiation.” La. R.S. 30:2003. Pursuant to La. R.S. 30:2011, the D.E.Q. was created as
the primary agency in the state concerned with environmental protection and regulation. The department [was given] jurisdiction over matters affecting the regulation of the environment within the state, including, but not limited to the regulation of air quality, noise pollution control, water pollution control, the regulation of solid waste disposal, the protection and preservation of the scenic rivers and streams of the state, the regulation and control of radiation, the management of hazardous waste, and the regulation of those programs which encourage, assist, and result in the reduction of wastes generated within Louisiana. (Emphasis supplied.)
Moreover, the section of the Louisiana Environmental Quality Act addressing enforcement inspections delineates its purpose as follows:
|2The protection of the environment and public health requires timely and meaningful inspections of all facilities subject to the provisions of this Subtitle- The purpose of such inspections is to determine whether any of the following conditions exist:
(1) Environmental standards have been achieved.
(2) There is an emergency under the provisions of this Subtitle
(3) There is a present or potential danger to the health or environment.
(4) A violation of the provisions of this Subtitle or rules, regulations, or orders pursuant thereto has occurred.
(5) Under the provisions of this Subtitle, there is an abandoned waste site. (Emphasis supplied) La. R.S. 30:2012(A).
The D.E.Q. has been designated as the primary state agency and public trustee of environmental protection and regulation. La. R.S. 30:2002. It has been granted specific jurisdiction over solid waste disposal regulation. La. R.S. 30:2011(A)(1). Its actions must be diligent, fair, and faithful to protecting the pubic interest in the state’s resources. In the Matter of American Waste and Pollution Control Company, 93-3163 pp. 8-9 (La.9/15/94), 642 So.2d 1258, 1262.
The majority’s premise that the statutory duty of D.E.Q. to protect the public extends beyond the directive to oversee environmental conditions, to add supervision of traffic conditions, is flawed. The reference to “safety and welfare of the people of Louisiana” in La. R.S. 30:2152 clearly alludes to environmental conditions relative to the disposal and utilization of solid waste. The majority specification to “strictly enforced programs for the safe and sanitary disposal of solid waste,” “unannounced regular inspections,” and a requirement of inspections of facilities, as delineated in La. R.S. 30:2002, is again concerned with the environmentally safe disposal of solid waste, not safety of traffic conditions.
The Louisiana Environmental Quality Act, “Louisiana Solid Waste Management and Resource Recovery Law” directs the secretary of the D.E.Q., in La. R.S. 30:2154,
(l)(a) [t]o adopt and promulgate rules, regulations, and standards for the transportation, processing, resource recovery, and disposal of solid wastes consistent with the general solid waste management plan adopted by the office. Such rules and regulation shall include but not be limited to the disposal site location, construction, operation, compliance deadlines, siting of stations for the off-loading and trans-loading of treated solid waste and sewage sludges, and maintenance of the disposal process as necessary to implement the purpose and intent of this Chapter.
The thrust of La. R.S. 30:2154 is focused on control and regulation of pollution in the interest of public health. There is no mention of traffic safety. Transportation safety of persons performing the delivery of hazardous materials is not part of the purpose of *303 the legislation under preview herein. Any responsibility of D.E.Q. to monitor the land sites for environmental quality clearly did not encompass the unrelated area of vehicular safety. See Berry v. State, Department of Health and Human Resources, 93-2748, p. 4-5 (La.5/23/94); 637 So.2d 412, 414.
The permit application requirement of flagmen at solid waste landfills is a departmental rule issued by D.E.Q. under the aegis of environmental safety. In its discretionary authority, D.E.Q. promulgated a permit requirement that a spotter, or traffic control attendant, be employed at a sanitary landfill as a prerequisite to obtaining a permit. The program manager of the enforcement program of D.E.Q. indicated, via sworn statement, that this requirement facilitates the goal of “properly utilizing all available area.” The Environmental Regulatory Code, Part VII, Title 33, Chapter 13, assigns safety responsibility for the operation of the landfill sites to the operator. Safety of the environment is not the subject, or a cause of action, in this litigation.
Moreover, there is no indication that D.E.Q. assumed more than an internally imposed duty to advise permit applicants that they must retain a flagman on site. Thus, the lack of any regulatory monitoring of the existence vel non of flagmen at the Ashland landfill does not violate a duty of D.E.Q.. The risk of injury caused by a vehicular collision is not within the scope of protection of La. R.S. 30:2002, which directs D.E.Q. to monitor landfill sites for environmental protection.
In the absence of a duty imposed on D.E.Q. to inspect landfill sites, and particularly the Ashland landfill, for traffic controllers, even taking the facts as alleged in the petition as amended, the law does not afford a remedy. Edwards v. Patterson, 94-1672, p. 3 (La.App. 1st Cir. 8/18/94); 641 So.2d 219, 221. There is no valid cause of action against D.E.Q. on the basis of the failure of the landfill owner to have on-site traffic controllers in compliance with the application requirement.
The duty of the Terrebonne Parish Government is not addressed. However, there is no connexity between TPCG, a flagman for traffic control, and D.E.Q..
EXCEPTION OF PRESCRIPTION
Assume, arguendo, that the petitioner herein had advanced a valid cause of action on the basis that D.E.Q. knew, or should have known, that TPCG was operating in violation of its permit. Namely, D.E.Q. failed to enforce the permit requirements that the parish provide a | ^flagman or penalize T.P.C.G.[1] The protective measure of extending prescription by interruption is not needed when one knows, or should have known, of the existence of joint tortfeasors. Joint tortfeasors have historically been considered solidarity liable; however, the relatively new concept of pure comparative negligence in tort eases has eroded the original raison d’etre of joint tortfeasors. Joint tort-feasors are no longer liable for the whole. The codal provisions for prescription, as it relates to joint tortfeasors in La. C.C. art. 2324, should not be allowed to be misused to withhold the giving of fair notice to an alleged tortfeasor. This would circumvent the general theorem of prescription.
The Louisiana Supreme Court has observed:
A fundamental purpose of prescriptive statutes is to protect a defendant from stale claims and from the loss or non-preservation of relevant proof. Prescriptive statutes seek to prevent prejudice to a defendant either by a delay in notification of the claim ... or by the loss of documents or witnesses which the defendant would have gathered or preserved if timely notified. Tate, Amendment of Pleadings in Louisiana, 43 Tulane Law Review 211, 233 (1969).
Findley v. City of Baton Rouge, 570 So.2d 1168, 1170 (La.1990).
In those situations, as exists herein, where a party asserting a claim against a tortfeasor knew, or should have known, of the existence of a joint tortfeasor, the prescription articles relating to the fairness of notice within a certain period of time should not be permit *304 ted to be undermined on the sole basis that the matter involves joint or solidary obligors. Otherwise, in essence, solidarity and joint relationships today exists primarily to defeat prescription. Such a purpose, when the plaintiff knows or should have known of the existence of the tortfeasor, should be carefully scrutinized. There is no demonstration that the petitioner was prevented at any time during the year’s time allowance for prescription from ascertaining D.E.Q.’s role in the issuance of permits and its requirement that applicants provide flagmen. Neglect or willfully withholding notice of suit, while knowing all the players, smarts of playing a card from the bottom of the deck. Actual and/or legal knowledge should, and does, demand timely action within the prescriptive period set out by the legislature.

. I cannot envisage how the vast majority of the populace would be served: the accumulation of garbage would fester, thus producing rot and disease.